**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| REGINALD HENDERSON | ) | |
| | ) | Case No. 23 C 4802 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. Thomas M. Durkin |
| | ) | |
| v. | ) | Magistrate Sheila M. Finnegan |
| | ) | |
| KENNETH BOUDREAU, THE ESTATE OF | ) | |
| WILLIAM FOLEY, JOHN HALLORAN, | ) | |
| MICHAEL CLANCY, JAMES O'BRIEN, | ) | |
| PATRICK GOLDEN, RICHARD COUGHLIN, | ) | |
| ASSISTANT STATE'S ATTORNEY VIRGINA | ) | |
| BIGANE, ASSISTANT STATE'S ATTORNEY | ) | |
| STEVEN KLACZYNSKI, CITY OF CHICAGO, | ) | |
| and COOK COUNTY. | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**DEFENDANT CITY OF CHICAGO'S ANSWER, AFFIRMATIVE DEFENSES
AND JURY DEMAND TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant City of Chicago ("City"), by its attorneys, The Sotos Law Firm, P.C., for its

Answer, Affirmative Defenses, and Jury Demand to Plaintiff's First Amended Complaint, states:

**INTRODUCTION**

1.      Plaintiff, Reginald Henderson, spent 26 years incarcerated in the Illinois

Department of Corrections for the 1994 murder of Rodney Collins – a crime he did not commit.

**ANSWER:**      Defendant City denies Plaintiff was incarcerated in the Illinois Department of
Corrections for 26 years for the murder of Rodney Collins. Defendant City lacks
knowledge or information sufficient to admit or deny the remaining allegations in
paragraph 1.

2.      In and around March 1994, the Defendants conspired among themselves and with

others, known and unknown, to prosecute Plaintiff for the murder of Collins while indifferent to

the fact that he was innocent.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 2.

3.     The Defendant Officers' motive to frame Plaintiff, or more specifically his brother and co-Plaintiff Sean Tyler, derived from Tyler's role in exposing egregious police misconduct carried out by some of the Defendants in this case.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 3.

4.     Tyler had witnessed the 1991 shooting that resulted in the arrests of six juveniles, including Marcus Wiggins, a 13-year old, who was tortured into confessing to murder by now-disgraced former Chicago Police Commander Jon Burge and his henchmen, Defendants Boudreau and O'Brien. Having witnessed the shooting, Tyler knew Wiggins was innocent and was poised to give exonerating testimony at Wiggins' trial. Such testimony would corroborate Wiggins' claims of torture which were already making national and international news and led to a high-profile federal civil-rights lawsuit by Wiggins.

**ANSWER:** Defendant City, on information and belief, denies that former Chicago Police Commander Jon Burge or Defendants Boudreau and O'Brien tortured Marcus Wiggins into confessing to murder. Defendant City, on information and belief, admits that Wiggins filed a federal civil-rights lawsuit naming Burge, O'Brien, and Boudreau (among others) as defendants. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 4.

5.     A trial court judge suppressed Wiggins' confession and the case against him was eventually dropped. Wiggins' federal civil rights case against Burge and Defendants Boudreau and O'Brien resulted in a substantial monetary settlement. Defendants Boudreau and O'Brien were disciplined for their mistreatment of the juvenile defendants, and Jon Burge was fired from the police department in 1993.

**ANSWER:** Defendant City, on information and belief, admits that Cook County Circuit Court Judge Walter Williams granted Wiggins' motion to suppress his statement implicating himself in the 1991 murder of Alfredo Hernandez and that the

criminal case against him was eventually dropped by the Cook County State's Attorney's Office. Defendant City further admits, on information and belief, that in 1993 Jon Burge was separated from the Chicago Police Department. Defendant City denies that the allegations in this paragraph accurately describe any discipline related to Defendants Boudreau and O'Brien. Answering further, Defendant City, on information and belief, admits that Wiggins' federal civil rights case settled for $95,000. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 5.

6.      The Defendants in this case sought to exact revenge on Marcus Wiggins, Sean Tyler, and by extension his brother, Plaintiff Reginald Henderson. Because the City of Chicago condoned, indeed encouraged, the misconduct of the Defendant Officers, the Defendants were successful in their plot to frame Tyler and Henderson for the murder of Collins. Luckily for Wiggins, he was not in the state when Collins was shot but that didn't stop the Defendant Officers from trying to frame him too.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 6.

7.      Defendant Bigane and Klaczynski, both felony review assistant Cook County State's Attorneys, while acting in an investigatory function and without any probable cause to believe Plaintiff committed the crime, conspired between each other and the defendant officers to procure a fabricated confession from Plaintiff. For her part, ASA Bigane manufactured out of whole cloth a false oral statement that she attributed to the Plaintiff.

**ANSWER:**   Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 7.

8.      All of the defendants concealed the fact that they had conspired to and did frame Plaintiff for the murders by attributing fabricated oral admissions to the Plaintiff, by coercing, threatening, and manipulating witnesses into making false statements implicating Plaintiff in the murders, and by physically coercing a fabricated handwritten statement from Plaintiff that he signed under coercion.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 8.

9.     No eyewitnesses to the murder identified Plaintiff, and no physical evidence connected him to [sic] crime. Without the Defendants' concealment of evidence, falsification of evidence, manipulation of witness testimony, and physical coercion of Plaintiff's false inculpatory statements, Plaintiff would never have been convicted.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 9.

10.    For nearly three decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame countless men and lie about it under oath. Indeed, the Defendants in this case are among the most notorious, repeat offenders in the history of the Chicago Police Department and responsible for untold numbers of wrongful convictions.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 10.

11.    On September 21, 2021, Cook County Circuit Court Judge Flood vacated Plaintiff's convictions at the request of the State. That same day, the State moved for an order to *nolle prosequi* the charges against Plaintiff. Plaintiff had already served his entire 55-year sentence.

**ANSWER:**   Defendant City, on information and belief, admits that Plaintiff's convictions were vacated and the Cook County State's Attorney's Office dismissed the criminal charges against him but denies that Plaintiff had already served his entire 55-year sentence. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 11.

12.    Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are

directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 12.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

**ANSWER:**     Defendant City admits that this action is brought pursuant to 42 U.S.C. § 1983 and a state law claim for indemnification. Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 13.

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

**ANSWER:**     Defendant City admits the allegations in paragraph 14.

## PARTIES

15.     Reginald Henderson is a 48-year-old man, is a citizen of the United States, and resides in Davenport, Iowa. Mr. Henderson spent 26 years incarcerated in the Illinois Department of Corrections for a murder he did not commit.

**ANSWER:**     Defendant City admits that Plaintiff spent 26 years incarcerated in the Illinois Department of Corrections. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 15.

16.     At all relevant times hereto, Defendants Detectives Kenneth Boudreau (#17998 or 20435), William Foley (#20450), John Halloran (#20453), Michael Clancy (#20325 or #20395), James O'Brien (#20466), and Defendant Officers Patrick Golden (#5363), [sic] Richard Coughlin (#2465) were members of the Chicago Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment

5

during the investigation of the murder.

**ANSWER:** Defendant City admits the allegations in paragraph 16.

17. Defendants Virginia Bigane and Steven Klaczynski, at all relevant times, were Assistant Cook County State's Attorneys. Defendants Bigane and Klaczynski, while acting in an investigatory fashion, procured a fabricated statement from Plaintiff. Defendants are sued for conspiring with the Defendant Detectives and Officers to frame Plaintiff while acting in an investigatory capacity and without probable cause to believe that Plaintiff committed a crime.

**ANSWER:** Defendant City admits Defendants Bigane and Klaczynski were Assistant State's Attorneys at the time of Plaintiff's arrest. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 17.

18. Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

**ANSWER:** Defendant City admits that it is an Illinois municipal corporation which employed the named Officer Defendants at the time of the investigation of the murder of Rodney Collins. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 18.

19. Defendant Cook County is a governmental entity within the State of Illinois which provides funding for the Cook County State's Attorney's Office, which is responsible for paying any judgment entered against the Defendant Assistant State's Attorneys Bigane and Klaczynski.

**ANSWER:** Defendant City admits that Defendant Cook County is a governmental entity within the State of Illinois which provides funding for the Cook County State's Attorney's Office. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 19.

20. Each of the individual Chicago Police Officer Defendants and Assistant State's Attorney Defendants are [sic] sued in his or her individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

**ANSWER:**   Defendant City admits that each of the individual Chicago Police Officer Defendants is sued in his individual capacity and acted under color of law and in the scope of his employment during the investigation of the Collins murder. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 20.

## FACTUAL ALLEGATIONS

21.   On March 29, 1994, 10-year-old Rodney Collins was shot and killed near 5151 S. Winchester while playing outside with his friends.

**ANSWER:**   Defendant City, on information and belief, admits the allegations in paragraph 21.

22.   Plaintiff Henderson was at his girlfriend's (Katrina Bones) home located at 5221 S. Woods at the time of shooting. Also present in the house was Katrina's mother, Donna Bones.

**ANSWER:**   Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 22.

23.   The Defendant Officers schemed to frame Plaintiff, his brother Sean Tyler, and Marcus Wiggins for Collins' murder despite the absence of evidence suggesting that Plaintiffs and Wiggins had any involvement in the shooting. Indeed, both brothers had strong alibi evidence that went entirely ignored by the Defendant Officers. For his part, Wiggins was never charged because he was not even in the state at the time of the shooting, making the frame-up plan untenable.

**ANSWER:**   Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 23.

### The Defendant Officers' Vendetta Against Sean Tyler, and by Extension, his Brother Reginald Henderson

24.   The Defendant Officers used the tragic murder of Rodney Collins' (sic) to exact revenge on Sean Tyler, and by extension, his brother Reginald Henderson, because of Tyler's role in exposing horrific misconduct on the part of Defendants Boudreau and O'Brien and their boss (and idol) Jon Burge.

**ANSWER:**     Defendant City denies Jon Burge was a supervisor of Defendants Boudreau and O'Brien during the investigation of the murder of Rodney Collins. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 24.

25.     On September 25, 1991, Alfredo Hernandez was shot and killed on the south side of Chicago. Six juveniles were arrested for the murder, including 13-year-old Marcus Wiggins.

**ANSWER:**     Defendant City, on information and belief, admits that on September 25, 1991, Alfredo Hernandez was shot and killed on the south side of Chicago, and that 13-year-old Marcus Wiggins and five other individuals were arrested for the murder. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 25.

26.     Sean Tyler, who was outside near his home at the time Hernandez was shot, witnessed the shooting and knew that Wiggins was not involved. Tyler was terrified to come forward with the exonerating information, because he had heard that police officers at Area 3 Violent Crimes had tortured suspects and witnesses. He was not wrong.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 26.

27.     Wiggins was charged with Hernandez's murder and eventually confessed to the crime after suffering unimaginable terror at the hands of several Area 3 detectives, including Defendants O'Brien and Boudreau. Wiggins revealed that Defendants O'Brien and Boudreau beat him viciously with a flashlight and electroshocked him. Defendants Boudreau and O'Brien had been taught by their mentor Jon Burge how to use an electroshock device to physically coerce confessions from suspects.

**ANSWER:**     Defendant City, on information and belief, admits that Wiggins signed a written statement implicating himself in Hernandez's murder and that he was charged with the crime. Defendant City denies, on information and belief, that the allegations in this paragraph accurately describe Wiggins' subsequent allegations to the Office of Professional Standards. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 27.

28.     Indeed, just two months after Wiggins' arrest, Jon Burge was separated from the

8

Chicago Police Department in the wake of an OPS investigation that revealed that Jon Burge and officers under his command engaged in systematic abuse of arrestees that constituted planned torture. Burge was formally fired in 1993. Burge's minions, including the Defendant officers, were furious at Burge's treatment by the department and vowed to vindicate him.

**ANSWER:** Defendant City admits that in 1993 Jon Burge was separated from the Chicago Police Department. Defendant City denies that the allegations in this paragraph accurately reflect the basis of his separation and further denies that any allegations are related to the Defendant Officers. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 28.

29. Wiggins' coerced confession was later suppressed by a Cook County Circuit Court judge. After the suppression hearing, Sean Tyler was identified as a witness who would exonerate Wiggins. Because of his fear of retribution, the Cook County judge entered a protective order directing all officers involved in the Hernandez investigation to avoid contact with Tyler. Unsurprisingly, Defendants Boudreau and O'Brien paid no mind to the court's order.

**ANSWER:** Defendant City, on information and belief, admits that Cook County Circuit Court Judge Walter Williams granted Wiggins' motion to suppress his statement implicating himself in the Hernandez murder. Defendant City further admits, on information and belief, that Cook County Judge Earl Strayhorn entered a protective order but deny that the allegations in this paragraph accurately describe the protective order. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 29.

30. Marcus Wiggins' case was eventually dismissed, and all of his co-defendants were either acquitted or had their cases dismissed by the State to the fury of the Defendants.

**ANSWER:** Defendant City, on information and belief, admits that Marcus Wiggins' criminal case was eventually dismissed. Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 30.

31. The Office of Professional Standards ("OPS") found that Defendants Boudreau and O'Brien violated the rights of five juvenile arrestees, including Wiggins. Defendant Boudreau and O'Brien were also sued by Wiggins in a high-profile civil lawsuit that made

national and international news. *Wiggins v. Burge, et al.,* 93 C 0199.

**ANSWER:** Defendant City, on information and belief, deny that the allegations in this paragraph accurately describe the investigation and findings related to Defendants O'Brien and Boudreau by the Office of Professional Standards. Defendant City further admits, on information and belief, that Defendants Boudreau and O'Brien were sued by Wiggins in a civil lawsuit *Wiggins v. Burge, et al.* (93 C 0199). Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 31.

32. The *Wiggins* civil lawsuit settled in 1996 for a significant sum of money.

**ANSWER:** Defendant City, on information and belief, admits that *Wilson v. Burge, et al.* (93 C 199) settled in 1996 for $95,000. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 32.

33. Suffice it to say, the Defendant Officers were out for vengeance.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 33.

### The Collins' Murder Investigation

34.    While Wiggins' criminal case and his civil lawsuit were making their way

through the courts, the Defendants brazenly schemed to frame the Plaintiffs (sic) *and* Wiggins

for the murder of Collins even while under the scrutiny of heavy media attention.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 34.

35.    Collins was shot and killed on the 5100 block of South Winchester street at

roughly 5:00 p.m. on March 29, 1994. Witnesses to the shooting described two offenders: (1)

Black male, 17 years old, 5'8", 130 lbs., hair in braids, and wearing a Black/Green FILA jacket;

and (2) Black male, 16 years old, 5'6" years old, 130 pounds, wearing dark jacket and white

pants.

**ANSWER:** Defendant City, on information and belief, admits that Collins was shot and killed on the 5100 block of South Winchester street at approximately 5:00 p.m. on March 29, 1994. Defendant City, on information and belief, admits that descriptions of 2 offenders were provided by witnesses but denies that the

complete description is delineated in this paragraph.

36.     Defendants Foley and Clancy arrived at the scene of the shooting and decided that the shooting was carried out by Gangster Disciples ("GDs"), notwithstanding that the only evidence at the time consisted of witness statements describing the offenders as two Black males.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 36.

37.     Defendants Foley, Clancy, and Boudreau directed 9th District Tactical Officers to round up known GDs for questioning, including a person named Antoine Ward ("Twan"). The Defendant Officers had no basis to believe that Ward was involved in the shooting but planned to bring him into custody to interrogate him to create probable cause to arrest the targets of their frame-up, namely Plaintiffs and Marcus Wiggins.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 37.

38.     At the direction of Defendants Foley, Clancy, and Boudreau, 9th District Tactical Officers arrested Ward in a home located at 51st and Honore after finding him asleep on the couch in the basement. The officers falsely testified at a suppression hearing that an unknown homeless man told them that GDs were hanging out in the basement of a house located at 51st and Honore and that after obtaining permission to enter the home, they woke up Ward who was sleeping on the couch. The officers falsely testified that they arrested Ward because he assaulted them when they shook him out of his sleep.

**ANSWER:**     Defendant City, on information and belief, admits that Ward was located at 5139 S. Honore and that Ward was arrested for an outstanding warrant for unrelated drug charges and transported to Area One. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 38.

39.     Defendant Foley falsely claimed, both in a supplemental police report and under oath at Plaintiff's trial, that an anonymous person called him and told him that Ward and his

11

friend "Yogi" (Kenneth McGraw) were present at the shooting. To bolster the fabricated

"anonymous tip," Defendant Foley also falsely claimed that 9th District Tactical Officers

disclosed that an "informant" told them that "Twan" and "Yogi" were involved in the shooting.

**ANSWER:**     Defendant City, on information and belief, admits that detectives investigating the Collins homicide received an anonymous phone call that relating that "Twan" and "Yogi" were at the scene of the shooting, and that 9th District tactical officers stated that an informant advised them that "Twan" and "Yogi" were involved in the shooting. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 39.

40.     In reality, the Defendant Officers had manufactured a false factual basis to arrest

"Twan" and "Yogi" for the purpose of using them implicate [sic] the targets of their frame up,

namely Wiggins, Tyler, and Plaintiff.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 40.

41.     After Ward was in custody at the 9th District, Defendant Boudreau picked him up

and brought him to Area 1 for interrogation. Meanwhile, Defendants Foley, Clancy, Golden, and

Coughlin arrested McGraw and brought him to Area 1 for questioning. Probable cause did not

support the arrests of either men.

**ANSWER:**     Defendant City, on information and belief, admits that after Ward was located in the Ninth District lockup he was transported to Area One, where he was interviewed regarding the Collins homicide. Defendant City further admits, on information and belief, that Chicago police officers located Kenneth McGraw (also known as "Yogi") and transported him to Area One, where he was interviewed about the Collins homicide. Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 41.

42.     Ward and McGraw were interrogated throughout the evening of March 29, 1994

and into the morning of March 30, 1994 by Defendants Boudreau, Foley, and Clancy among

others. Ward and McGraw were beaten, threatened, and then promised release if they provided

statements fed to them by the Defendants, statements that implicated Sean Tyler, his brother

Reginald, and Marcus Wiggins.

12

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 42.

43.     After hours of physical and psychological abuse, McGraw agreed to repeat a false statement implicating Plaintiff, Sean Tyler, and Marcus Wiggins as being involved in the Collins' murder in the presence of Defendant ASA Klaczynski. ASA Klaczynski knew that Ward and McGraw were arrested unlawfully and had been physically coerced into providing false statements implicating Plaintiffs; he nonetheless took the coerced, false, and fabricated statement.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 43.

44.     That McGraw's statement was coerced, false, and fabricated is not in question where it was later determined that Wiggins could not have been involved in the shooting as he was living in another state at the time of the crime.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 44.

44.     Defendants Foley and Clancy informed Defendant O'Brien to arrest Henderson in light of McGraw's coerced and fabricated statement. In the afternoon of March 30, 1994 (the day after the shooting), Plaintiff Henderson was arrested at [sic] girlfriend's house located at 5221 S. Woods. Plaintiff was taken to 51st and Wentworth (Area 1) and placed in an interview room.

**ANSWER:**     Defendant City, on information and belief, admits that Henderson was located at 5221 S. Wood and that he agreed to accompany the officers to Area One to be interviewed, where he was subsequently arrested. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 44.

### Arrest and Interrogation of Plaintiff Henderson

45.     Once at Area 1, Plaintiff was shackled to a wall for a long period of time before the Defendant officers came into question him. Eventually, the Defendant Officers entered the

interrogation room to interrogate Plaintiff.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 45.

46.     Evincing (sic) their knowledge that Plaintiff was Tyler's brother (and their intent to frame Tyler), the Defendant Officers repeatedly referred to him as "Reginald Tyler." Reginald's last name was actually Henderson.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 46.

47.     The Defendant Officers told Plaintiff that they knew he was involved because his brother "Droopy" (Sean Tyler's nickname) was there. The Defendant Officers also told Plaintiff that Wiggins was involved. Plaintiff asked to call his mother so she could call a lawyer for him. That request was ignored. Plaintiff repeatedly denied being present or having any knowledge of the shooting.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 47.

48.     Plaintiff told the Defendant Officers that he was at the home of his girlfriend's mother, Donna Bones, at the time of the shooting located at 5221 S. Wood. Plaintiff repeatedly denied any involvement in the shooting. The Defendant Officers made no efforts to corroborate Plaintiff's alibi.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 48.

49.     The Defendant Officers left out of the interrogation room but returned sometime later. Defendant Foley grabbed Plaintiff by the throat and told him he was lying. Defendant Foley threatened Plaintiff with wrongful prosecution if he did not cooperate with the Defendants by repeating the false narrative fed to him. Defendant Foley struck Plaintiff multiple times and threated to falsely charge him.

14

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 49.

50.     At one point, Plaintiff's head was slammed into a desk when he refused to adopt the false statements being fed to him by the Defendant Officers. The Defendant Officers repeatedly threatened to charge Plaintiff with the shooting knowing that he was not involved and knowing that they had coerced McGraw into making false statements implicating him.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 50**.**

51.     Defendants Halloran and Boudreau admitted to interrogating Plaintiff and falsely claimed that he made inculpatory oral statements to them.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 51.

52.     Defendant Bigane interviewed Plaintiff at Area 1 in the presence of Defendant Halloran according to her. Plaintiff told Defendant Bigane that he was not involved in the shooting and that the Defendant Officers were mistreating him. In the presence of Defendant Bigane, the Defendant Officer slapped Plaintiff's head around his ears. Plaintiff made no statements to Defendant Bigane and Defendant Bigane did nothing to stop the abuse by the Defendant Officers. Defendant Bigane expressly condoned the Defendant Officers'' conduct.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 52.

53.     Plaintiff remained in custody for over 48 hours. He was never read his *Miranda* rights; he was denied food and water; and he was denied access to the restroom. Eventually, Plaintiff agreed to sign a statement crafted by the Defendant Officers.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 53.

54.     Fearful that his unlawful detention and coercive interrogation would continue

indefinitely, Plaintiff signed a statement that he did not write. Present during the signing of the statement was (sic) Defendants ASA Steve Klaczynski and Defendants Foley and Clancy. Plaintiff told Defendants Klaczynski, Foley and Clancy that he would sign the statement to put an end to his abusive treatment, but the statement was crafted based on the false story orchestrated by the Defendants.

**ANSWER:** Defendant City, on information and belief, admits that Defendants Foley and Clancy were present during the signing of Plaintiff's statement. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 54.

55.    Defendant ASA Klaczynski knew the statement was false and that Plaintiff was signing it under duress where Plaintiff never told Defendant ASA Klaczynski from his own mouth the story that was written on the papers. Instead, Plaintiff just agreed to sign it out of fear of continued abuse.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 55.

56.    At some later point, the Defendants Officers with the knowledge Defendant ASA Klaczynski realized [sic] that Plaintiff's fabricated confession including (sic) a fact that could not be true, namely that Wiggins was involved in the shooting. Wiggins was living outside the state of Illinois at the time of shooting.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 56.

57.    The Defendant Officers with the knowledge and assistance of Defendant ASA Klaczynski falsely claimed that Plaintiff switched his story to replace Wiggins with another person named Travis Ashby. When the Defendants discovered that Ashby also had an air-tight alibi, the Defendant Officers with the knowledge and assistance of Defendant ASA Klaczynski falsely claimed that Plaintiff swapped out Ashby for Andrew Ganoway. Defendant ASA

Klaczynski knew and participated in the construction of Plaintiff's false, fabricated and coerced statements where he helped change the story to conform to a shifting narrative formulated by the Defendants for the purpose of framing Plaintiffs.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 57.

58. Neither the Defendant Officers nor the Defendant State's Attorneys disclosed the manner in which they and their fellow colleagues coerced and fabricated Plaintiff's statements. Neither the Defendant Officers nor the Defendant Prosecutors disclosed the manner in which they coerced fabricated statements from Ward and McGraw.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 58.

59. Plaintiff Tyler was eventually brought into custody at Area 1 after telling the detectives where to find him. Tyler, a teenager who had limited contact with the criminal justice system, was interrogated extensively over the course of 12 hours.

**ANSWER:** Defendant City, on information and belief, admits that Tyler was brought into custody at Area One after telling the officers that he was across the street in the McDonald's restaurant. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 59.

60. Like his brother, Tyler was physically abused, repeatedly threatened, and told he was a liar when he denied involvement in the shooting. Tyler provided a verifiable alibi that was ignored by the Defendant Officers.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 60.

61. Following the physically coercive interrogation, Tyler eventually succumbed and provided a false statement fed to him by the Defendant Officers. After signing the statement, Tyler was taken to an emergency room because he was vomiting blood.

17

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 61.

### Wrongful Prosecution of Plaintiff Henderson

62.     Plaintiff was charged and eventually tried for the murder of Rodney Collins.

**ANSWER:** Defendant City, on information and belief, admits that Plaintiff was charged and tried for the murder of Rodney Collins. Defendant City lacks knowledge or information sufficient to admit or deny the remining allegations in paragraph 62.

63.     The State's case consisted entirely of fabricated evidence that was provided by the Defendant Officers and Defendant Prosecutors.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 63.

64.     Defendant Golden falsely testified at Plaintiff's suppression hearing and at trial that he [Golden] and his partner Defendant Coughlin picked up Plaintiff on the street on the afternoon of March 31, 1994 after learning that McGraw had implicated him in the shooting. Defendant Golden falsely testified that Plaintiff voluntarily accompanied them to Area 1 for questioning by detectives. In reality, Defendants Golden and Coughlin entered Donna Bones' home without an arrest warrant and arrested Plaintiff the afternoon of March 30, 1994 against his will, without his consent, and without probable cause to arrest.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 64.

65.     Defendant Golden also falsely testified at Plaintiff's trial that he learned information about Ward and McGraw in connection with Collins' shooting. Defendant Golden falsely testified that he tracked down McGraw and that McGraw voluntarily went to Area 1 for questioning. In truth, Defendants Foley and Clancy *directed* Golden to pick up McGraw and bring him to Area 1 for questioning. Defendants Golden and Coughlin raided the home where McGraw was sleeping and arrested him without probable cause. Defendant Golden's testimony to

the contrary was a compete fabrication.

**ANSWER:**   Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 65.

66.   Defendant Foley falsely testified at Plaintiff's trial that he received an anonymous phone call in connection with Collins' homicide, identifying the nicknames of Antoine Ward and Kenneth McGraw. This testimony was a blatant lie as there was no anonymous call. Defendant Foley also falsely claimed that Ward just happened to be in custody at the 9th District, when in truth, Defendants Foley, Clancy, and O'Brien had directed 9th District police officers to arrest Ward so they could interrogate him.

**ANSWER:**   Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 66.

67.   Defendant Foley falsely testified that Plaintiff admitted his involvement in the crime to him and Defendant Halloran. Defendant Foley falsely claimed that Plaintiff was never physically assaulted or threatened by any officer, including himself. Defendant Foley did not disclose that he and his fellow officers manufactured a narrative to frame Tyler and Wiggins or that they demanded Plaintiff to repeat the false story. Defendant Foley falsely testified that Plaintiff's handwritten statement was voluntarily provided and that the information contained in the statement came from Plaintiff.

**ANSWER:**   Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 67.

68.   Defendant Halloran also provided false and fabricated testimony at Plaintiff's suppression hearing at trial. Defendant Halloran falsely claimed that Plaintiff made inculpatory oral statements to him and Defendant Foley and again to him and Defendant Boudreau. Defendant Halloran lied when he testified that Plaintiff was not struck, threatened, or otherwise coerced into making these alleged oral statements. Defendant Halloran also provided false

testimony when he testified Plaintiff made an inculpatory statement to Defendant Bigane.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 68.

69. Defendant Bigane falsely testified at Plaintiff's trial that Plaintiff made an oral inculpatory statement admitting his involvement in the shooting, admitting that he planned the shooting with his friends, and provided a gun to one of the shooters. Defendant Bigane further lied when she denied that Plaintiff was not assaulted in her presence. Defendant Bigane, who never memorialized the alleged confession, manufactured the false statement from whole cloth.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 68.

70. Defendant ASA Klaczynski falsely testified that Plaintiff provided a handwritten statement that was free from duress and coercion. Defendant ASA Klaczynski had been present at Area 1 and had heard the Defendant Officers' use of coercive tactics with Ward, McGraw, and Henderson. He knew that physical abuse was used to obtain all of the statements, including Plaintiff's. He knew that the narrative that he wrote on the statement did not come from Plaintiff but came from the Defendant Officers. He gave false testimony when he testified that the statements were obtained lawfully.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 70.

71. The State also admitted into evidence the false, fabricated, and physically coerced handwritten statements of Kenneth McGraw even though McGraw denied the truth of the statement.

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 71.

72. Plaintiff was convicted based on the foregoing fabricated evidence and was

sentenced to 55 years in prison on October 1, 1996.

**ANSWER:**     Defendant City, on information and belief, admits that Plaintiff was convicted of the murder of Rodney Collins and sentenced to fifty-five years in prison. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 72.

### Plaintiff's Exoneration

73.     Plaintiff always maintained his innocence and worked tirelessly to prove it.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 73.

74.     Despite limited education and no resources, Plaintiff attempted to demonstrate his innocence through the filing of post-conviction petitions as a *pro se* litigant.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 74.

75.     Armed with new evidence showing a prodigious pattern and practice of misconduct by the Defendant Officers dating back decades, Plaintiff's actual innocence claims were advanced to a third-stage evidentiary hearing.

**ANSWER:**     Defendant City admits Plaintiff's claims were advanced to a third-stage evidentiary hearing. Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 75.

76.     Plaintiff was released from custody on April 16, 2020 after having served his entire sentence. He continued his quest to prove his innocence.

**ANSWER:**     Defendant City denies that Plaintiff served his entire 55-year sentence. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 76.

77.     On September 17, 2021, on the eve of a scheduled evidentiary hearing, the State consented to post-conviction relief for both Plaintiff and his brother. The State then moved to dismiss all charges against both Plaintiffs - 27 and 1/2 years after Plaintiff's wrongful arrest.

**ANSWER:**     Defendant City, on information and belief, admits that the State dismissed all

charges against Plaintiff and his brother, Sean Tyler related to the murder of Rodney Collins. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 77.

### Pattern of Misconduct By Defendants Foley, Halloran, Clancy, Boudreau, and O'Brien

78.     Since his trial and conviction, Plaintiff Henderson has learned that his experience with the Defendant Officers of Area 1 is not unique. This is not the first instance of Defendants Foley, Halloran, Clancy, Boudreau, and O'Brien using physical and psychological abuse to close a case. These detectives have a long standing pattern of engaging in such misconduct.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 78.

79.     For example, Defendant Foley, the lead detective on Plaintiff's case and the detective primarily responsible for violently coercing a false confession and lying about Plaintiff's confession has since been revealed as the detective who obtained a false confession from Harold Richardson in the now-notorious "Englewood Four" case. In that case, all four convicted men were exonerated when DNA from a serial rapist murderer was discovered at the crime scene; that same DNA excluded all four defendants. Mr. Richardson was later awarded a Certificate of Innocence despite the confession obtained by Defendant Foley.

**ANSWER:**     Defendant City denies that the allegations in this paragraph accurately describe the criminal investigation related to Harold Richardson or the subsequent post-conviction proceedings. Defendant City admits Richardson was granted a Certificate of Innocence. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 79.

80.     In that same case, Defendants Foley and Boudreau coerced a false confession from one of Richardson's co-defendants, Terrill Swift. The City of Chicago recently paid over $31 million to settle claims that Defendant Foley and Boudreau coerced false confessions from the Englewood Four.

**ANSWER:** Defendant City denies the allegations in this paragraph accurately describe the criminal investigation related to Terrill Swift and the co-defendants or the subsequent post-conviction proceedings. Defendant City admits that approximately $31 million total was paid in settlement of the four civil lawsuits brought by the co-defendants but denies that this settlement reflected any admission of liability on behalf of the City or defendant officers. The City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 80.

81. After the Englewood four were exonerated, the FBI discovered an insider's account of how those false confessions were obtained. Former Assistant State's Attorney Terrence Johnson revealed that detectives, including Defendants Foley and Boudreau, told the Englewood Four they could go home if they cooperated by confessing to the crime and implicating others. They were told "witnesses go home." Johnson further reported that the detectives created a "cheat sheet" to help them keep their stories straight when testifying at the subsequent motion to dismiss brought by the Englewood Four.

**ANSWER:** Defendant City denies that the allegations in this paragraph accurately describe the criminal proceedings related to Richardson, Swift, Saunders, and Thames or the FBI investigation. Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 81.

82. The Detectives were successful. The motions to suppress were denied and the Englewood Four were convicted despite, just as here, no forensic evidence [sic] inculpating them. Fortunately, advanced DNA testing helped exonerate the four.

**ANSWER:** Defendant City admits that certain motions to suppress were denied and that Richardson, Swift, Saunders, and Thames were convicted. Defendant City denies that the allegations in this paragraph accurately describe the criminal investigation or the subsequent post-conviction proceedings. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 82.

83. Defendant Boudreau is one of the notorious homicide detectives who, under former Chicago Police Commander Jon Burge, had a lengthy history of physically and psychologically coercing suspects to "confess" to serious violent crimes.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 83.

84.     In total, Defendant Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the "confessions."

**ANSWER:** Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 84.

85.     In an examination of thousands of murder cases in Cook County from 1991 through 2000, *The Chicago Tribune* found that Defendant Boudreau and many of his colleagues had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

**ANSWER:** Defendant City admits that the Chicago Tribune published an article as alleged in paragraph 85 but denies that paragraph 85 accurately describes the article Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 85.

86.     As *The Chicago Tribune* observed, "Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs." See "Veteran Detective's Murder Cases Unravel," *The Chicago Tribune*, December 17, 2001, available at https://www.chicagotribune.com/investigations/chi-011217confession-story.html (last visited on July 18, 2023).

**ANSWER:** Defendant City admits that paragraph 86 accurately quotes the December 17, 2021 Chicago Tribune article. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 86.

87.     For a two-year period in the early 1990s, Defendants Boudreau and his partners helped "solve" at least five murders with "confessions" that ended with acquittals. All of these

24

suspects alleged that Defendant Boudreau and/or Defendant Halloran mistreated them to obtain false confessions.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 87.

88.     The list of abuses by Defendant Officers Foley, Halloran, Clancy, Boudreau, and O'Brien include the following, all of which are corroborated by sworn testimony:

  a.  In 1987, Defendant Foley worked with other Chicago detectives to obtain a false confession from Frank Bounds for a murder. The detectives hit Bounds on the head and threatened to implicate Bounds's girlfriend in the murder if he did not confess. As a result, Bounds agreed to sign a statement implicating himself in a brutal rape-murder that he alleges he had nothing to do with.

  b.  Anthony Robinson was arrested in 1987 for murder. Robinson asserted that he was repeatedly kicked and slapped by Defendant Foley and two other detectives during his interrogation. Three days later, Robinson sought medical treatment for his left ear and was diagnosed with a perforated eardrum. According to Robinson's sister, she observed her brother in the interrogation room handcuffed to a wall and bleeding from his nose and mouth; he later complained that he had been kicked in the groin. Robinson was released, but six months later, he was arrested on the same charge. After being slapped again by, upon information and belief, Officer Michael Kill, Robinson became extremely frightened that what happened to him before could happen again (and worse) and signed a false confession.

  c.  In 1988, Defendant Halloran and a partner struck Mickey Grayer in the stomach and groin with a flashlight, and punched and choked him.

  d.  Desmond Weston alleged that in 1990, he was abused by Defendant Moser along

with Detectives Anthony Maslanka and Michal Kill while being interrogated. Weston was arrested for murder after he was identified as the perpetrator by Dwayne Macklin. Macklin has since fully recanted his identification, alleging that he only gave it because of the police officers' physical beating, threats and promises of a lesser sentence on an unrelated charge that Macklin was facing. In 2019, Weston's conviction was vacated and the charges against him were dismissed.

e.  In 1990, Cortez Brown was tortured by Defendant O'Brien into confessing to two murders with which he had absolutely nothing to do. Defendant O'Brien, along with Detectives John Paladino and Anthony Maslanka, beat Brown about his head and body, including with a flashlight. Brown was denied food and his right to an attorney.

f.  In September 1991, Defendant Boudreau and other physically and emotionally abused 15-year old Anthony Jakes in order to coerce a false confession for a murder Jakes did not commit. During the over 16 hours Jakes was held and interrogated, Boudreau and others slapped, punched, and kicked Jakes, threatened to recruit gang members to kill his family, tried to burn Jakes with cigarettes, and deprived him of access to food, water, and contact with an attorney or family member. Jakes was convicted of the murder based on his false confession. In 2018, his conviction was vacated, and Jakes filed a federal civil rights lawsuit against Boudreau and his cohorts.

g.  In 1991, fifteen-year-old John Plummer was interrogated for 36 hours by Defendants Boudreau, Halloran, Foley, and Clancy. After being physically beaten, he falsely confessed to a murder. Defendant Halloran has taken the Fifth

Amendment regarding Plummer's allegations.

h. In 1991, Sandy Cutis alleged that Detectives Moser and Paladino tortured him to secure a confession. According to Curtis, Moser and Paladino struck him on his face and lower body with their fists. Curtis also alleged that Paladino bent his finger back and that unknown officers kicked him as he lay on the floor. As a result, Curtis confessed to a crime that he did not commit.

i. Defendants Foley and/or O'Brien coerced a signed false confession out of Javan Deloney in 1991. The detectives denied his right to an attorney and used physical violence to coerce the confession, hitting him in the chest and slapping him in the face. This, all despite his insistence that he was not involved in the murder.

j. In 1991, Defendant Boudreau obtained a murder confession from Alfonzia Neal, testifying that Neal waived his rights and signed a statement handwritten by a prosecutor. Experts established that Neal had an IQ in the 40s and that he was incapable of intelligently waiving his Miranda rights. Neal was acquitted at trial notwithstanding his signed confession.

k. Gregory Logan was interrogated regarding a murder in 1991 by Defendants O'Brien, Foley and other officers. When he professed his innocence, the detectives beat him with a bat, pushed his head against the wall and pointed a gun to his head. He was also denied the right to an attorney.

l. In 1992, Arnold Day was interrogated in connection with a murder investigation. After isolating Mr. Day in an interrogation room for hours, Defendants Boudreau and Foley forcefully grabbed Day by the neck and choked him. The detectives also threatened to throw Day out the window. Day ultimately confessed but was

nonetheless acquitted of the murder after presenting compelling allegations of police torture.

m.  In 1992, Dedrick Warmack, Sherman Warmack and Dario Bailey were coached by Moser into falsely identifying Xavier Catron as having shot and killed Kendrick Thomas. Dedrick Warmack recanted his testimony, along with the other two individuals, indicating that he was never certain that Catron was the shooter. Dedrick and Sherman Warmack testified that they only identified Catron after Moser told them to "focus in" on Catron.

n.  In November 1992, Defendants Boudreau, Halloran, and O'Brien jointly induced Harold Hill, Dan Young, and Peter Williams to provide interlocking confessions to raping and killing a woman. Notably, records revealed that despite confessing to murder, Williams was actually incarcerated at the time of the crime. Because of his demonstrated innocence, Williams was never charged. Hill and Young, however, were convicted although their confessions implicated Williams, who was undeniably innocent. Again, later DNA evidence exonerated Hill and Young, leading to their release from prison.

o.  In 1992, Clayborn Smith was interrogated for 37 hours about a murder he knew nothing about. When Mr. Smith professed his innocence, another detective kicked and punched his head and body, and Defendants Boudreau, Halloran, and O'Brien threatened to charge Mr. Smith's pregnant girlfriend if he did not confess. The detectives also grabbed Smith's neck, pulled his hair, and yanked his fingers back. At the end of the 37 hours, Smith falsely confessed. In pending post-conviction proceedings, the Court barred the state from denying that Boudreau and Halloran

engaged in a pattern of abuse between 1990 and 2001.

p.  In 1992, Kilroy Watkins was arrested and handcuffed to a metal ring in an
interrogation room by Defendants Boudreau and Halloran, who then choked and
punched him in order to get him to confess to a shooting. After more than 30 hours
in this room with minimal sleep and food, Watkins signed a false incriminating
statement.

q.  In May 1993, Terry King and Tyrone Hood were arrested for the murder of Marshall
Morgan Jr. Detectives Foley and Lenihan tried to get King to confess by beating him
about his face and body – just as Tyler was beaten here. King was left with a black
eye, bumps on his head and lacerations inside his jaw. King was ultimately released
without being charged when his alibi cleared.

r.  Tyrone Hood was beaten about the body by Boudreau, Ryan, Lenihan and Foley
while he was held at the lockup at 51st and Wentworth. Hood was also interrogated
by Boudreau and Halloran. So too for the witnesses in Hood's case, a number of
whom alleged the Defendants physically or psychologically coerced him. Hood has
been granted a Certificate of Innocence, and his civil lawsuit against Defendants
Ryan, Lenihan, Boudreau and Halloran recently settled.

s.  Hood's co-defendant was a man named Wayne Washington. Washington alleged
that he was held for two days. During that time, he was handcuffed, slapped in the
face, had his chair knocked out from under him, threatened, and not given food or
water until he agreed to give a false and fabricated statement inculpating himself
and Hood in the murder. Washington has also been granted a COI, and his civil
lawsuit against Defendants Ryan, Lenihan, Boudreau and Halloran recently settled.

t. In 1993, Emmett White was arrested by Defendants O'Brien, Clancy, Halloran and other detectives who hit him in the face, punched him in the body, threw him to the ground and stepped on his face, dragging his head across the floor of the interrogation room, all in an attempt to get him to falsely confess. Photographs of Mr. White corroborated his testimony of his abuse. Although the police alleged that White confessed to the crime, when asked about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

u. In 1993, Richard Anthony was forced to confess to murder by Defendant Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

v. Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Defendant Boudreau and his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

w. In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by Defendants Boudreau, O'Brien and Halloran, who refused to let him contact his family and beat him into confessing to a murder he did not commit. Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by Defendant Boudreau for murder despite the lack of any physical evidence or eyewitnesses linking Escamilla to the crime. The detectives tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After many hours of abuse, Escamilla eventually falsely confessed. Although

30

Morales was also beaten during his interrogation, he refused to confess.

x.  Therefore, to secure Morales' conviction, O'Brien, Halloran and Boudreau coerced John Willer and Raphael Robinson into identifying Morales as the offender. For example, O'Brien used a very suggestive lineup: He grabbed Robinson by the neck while Robinson was viewing a lineup and asked him "how many fingers am I holding up." When Robinson answered "three," O'Brien used this to say that Robinson had identified person number three. In addition, O'Brien spoke with Robinson prior to his trial testimony to explain who committed the murder and where in the courtroom they would be sitting.

y.  When asked about their interrogation and coercion of Escamilla, Morales, Willer and Robinson during a deposition in a civil suit, O'Brien and Halloran refused to answer any questions for fear of subjecting themselves to criminal liability.

z.  In December 1993, Defendants Boudreau and O'Brien, with other detectives, "closed" two separate murders by coercing confessions from two intellectually disabled juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses. One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted despite the confessions obtained by those Defendants.

aa. In 1994, Defendant Halloran and other police officers forced Sheila Crosby and Michael Sardin to identify Shondell Walker as the murderer in their grand jury testimonies. Halloran threatened to have the Department of Children and Family Services take Sheila Crosby's children away from her. They told Sardin that if he

31

did not name Walker, he would be charged with the murder.

bb. In 1993, Richard Anthony was forced to confess to murder by Defendant Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

cc. Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Defendant Boudreau and his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

dd. Derrick Flewellen signed a confession coerced by Defendants Boudreau, Halloran, and others after being interrogated for more than 36 hours, during which time he was slapped, kicked punched, and slammed into the wall by Boudreau and other detectives before succumbing to their coercion. After spending almost five years in prison, Flewellen was acquitted of the two murders when DNA tests proved the crime was committed by someone else.

ee. In 1994, then 15-year-old Michael Saunders was arrested for murder and interrogated by Clancy and Paladino. According to Saunders, he was slapped on the neck and had an earring pulled out of his ear. He was also denied access to his mother and grandmother, and denied access to an attorney. Under the weight of this pressure, Saunders falsely confessed to a murder that he did not commit.

ff. In 1994, Defendants Boudreau, Halloran, Moser, and Graf beat Anthony Williams into falsely confessing to murder and armed robbery.

gg. In 1994, Jamie DeAvila was arrested for murder and interrogated by Boudreau.

When DeAvila explained that he was not involved in the crime, Boudreau barked back that it did not matter because Boudreau "was going to plant a nigger and the crime scene to point [him] out as the driver of the murderer." DeAvila eventually falsely confessed to murder.

hh. In August 1994, David Wright was arrested and coerced into giving a false confession. Wright has alleged that Boudreau physically assaulted him, including choking him and shoving him against the wall, and made a false promise of leniency. As a result, and after an extended period in custody, Wright falsely confessed. Following an evidentiary hearing, in 2022, that confession was suppressed, and the State dismissed all charges against Wright.

ii. In 1995, Defendants Boudreau, Halloran, and O'Brien interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families, all in a successful attempt to coerce false confessions. All three defendants were found not guilty, based largely on the conclusion that the detectives physically coerced their confessions.

jj. In 1995, Defendants Boudreau and Halloran were part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in connection with a murder.

kk. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran and Boudreau interrogated him, they physically and psychologically coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime.

33

Since his interrogation, Little has fully recanted the statement he gave to police.

ll.  In 1996, Defendant O'Brien caused to individuals at the scene of a crime to falsely identify Jeremy Allen. Allen was ultimately acquitted at trial.

mm.  In February 1997, Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by Defendant O'Brien. O'Brien withheld evidence from the victim that another man, one who exactly fit the description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

nn. After police officer Michael Ceriale was shot to death in 1998, Defendant Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating (unwritten and unsigned) statements. Tolliver was never advised of his rights, no Miranda waiver was created, and his request to speak with a lawyer and/or his mother were refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

oo. In connection with the Ceriale murder, Defendant Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver. The means of coercion included an intentional withholding of insulin from one diabetic witness for more than 24 hours. When these witnesses later refused to testify at trial consistent with

the false statements coerced by Boudreau, the State charged five of them with

perjury and at least one of them went to jail for it.

pp. In 1998, Defendants O'Brien and Halloran punched Antoine Anderson in the lip and

chest, threatened to take away his children, and denied him his right to an attorney.

At the time Mr. Anderson was 17 years old and could barely read or write.

qq. In 1998, Defendants Boudreau and Halloran held Joseph Jackson in an interrogation

room in connection with a murder. When Jackson refused to confess, Defendants

Boudreau and Halloran placed a book on his chest and stomach and hit the book

with a blackjack, so as not to leave visible marks on Jackson's body. Meanwhile,

Defendants Boudreau and Halloran, using a torture technique referred to in the

Department as "bagging," placed a typewriter cover over Jackson's head and cut off

his air supply. As a result of this coercion, Jackson eventually confessed to a murder

he did not commit.

rr. In 1998, Defendant Boudreau helped get a murder confession from a 13-year-old

boy with a verbal IQ of 59. The judge later ruled that the boy did not have the

mental capacity to waive his rights and threw out the confession. Prosecutors then

dropped the charges.

ss. Christopher Holly filed a federal civil rights lawsuit against Defendant Boudreau

and other detectives alleging that he was framed for a murder in 1998.

tt. In May 1994, Fabian Pico was 16 years old when he gave a self-incriminating

statement to Boudreau and another detective that was used to convict him of

murder. When Pico moved to suppress the statement on the grounds that police did

not allow him access to his mother, Boudreau claimed he had tried unsuccessfully to

reach Pico's mother by phone before Pico confessed; but Boudreau's supposed attempt was not memorialized anywhere in his reports.

uu. In 1994, Nevest Coleman, an educated man with no criminal record, was arrested for a rape and murder he did not commit. Given that the body was buried in the basement of Coleman's apartment building, Boudreau, Halloran, Foley and Clancy set their sights on Coleman. Coleman repeatedly denied his involvement in the rape and murder, which was met with punches to Coleman's face. Eventually, the officers fed Coleman details about the crime and Coleman falsely confessed to being a lookout. In 2016, DNA evidence exculpated Coleman and his co-defendant. In 2017, Coleman was exonerated and the state dismissed all charges.

vv. Richard Malek alleges that Defendant Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, as well as using violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period. When they falsely claimed to have obtained an "oral" confession, Mr. Malek filed a federal lawsuit against Defendant Boudreau and others.

ww. In 1996, Andre Brown was handcuffed to a wall, threatened that he would never see family again if he did not confess to the shooting, was denied his request to speak with his mother or an attorney and was denied access to the restroom, all by Defendants Boudreau and Halloran and their brother officers.

xx. Marcus Wiggins brought a lawsuit against Defendants Boudreau, O'Brien and others

alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case. The detectives denied Wiggins's mother access to her son, who was a 13-year old eighth grader at the time of the coerced confessions. The other young suspects also gave confessions, many of them after being physically beaten as well. For example, Jesse Clemon and Iamari Clemon alleged that they were struck about their bodies, including with fists and flashlights. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that Boudreau testified he did not hear. All of the defendants were either acquitted or had their cases *nolle prosequied* by the State. In civil depositions in an unrelated lawsuit, O'Brien and Halloran took the Fifth Amendment when asked questions about the torture of Marcus Wiggins and his co-defendants.

yy. As mentioned above, after being beaten by Defendants Boudreau and O'Brien, Jesse Clemon signed a written statement with his left hand (because his right hand had been injured). Witnesses in the station heard hollering and protests of "I didn't do it." Boudreau testified that the statement was not coerced, but the judge suppressed it anyway due to the "horrendously oppressive" atmosphere at the station. During their investigation, Defendants Boudreau and O'Brien also threatened, beat, and electroshocked Jesse's brother, Demoni, and beat his other brother, Iamari, with a flashlight.

zz. Defendant O'Brien also slapped Curtis Mislap in the face, kicked him in the testicles while he was handcuffed, and threatened him. Milsap falsely confessed and was later acquitted.

aaa.   In 2004, Defendant Boudreau was involved in the illegal search and seizure of

Francis Bell. Defendant Boudreau beat Bell into signing a consent to search after

Defendant Boudreau already did the illegal search.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are
directed against it. Defendant City lacks knowledge or information sufficient to
admit or deny the remaining allegations in paragraph 88, including all its subparts.

89.    There are many other examples of similar misconduct by these same Defendant

Officers.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are
directed against it. Defendant City lacks knowledge or information sufficient to
admit or deny the remaining allegations in paragraph 89.

90.    The codefendants and witnesses involved in the investigation of the crime for

which Plaintiff was convicted make similar allegations against the Defendant Officers. As also

briefly mentioned above, Antoine Ward accused officers Halloran, Clancy, Foley and O'Brien of

stepping on his left hand, hitting him on the head, and refusing to let him use the restroom while

he was in interrogation for over 48 hours until he eventually urinated into a desk drawer.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the
allegations in paragraph 90.

91.    Kenneth McGraw claims that Defendant Boudreau beat him until he agreed to

give a statement implicating the men who were eventually convicted, including Plaintiff.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the
allegations in paragraph 91.

92.    Michael Taylor accused Defendants Halloran, Clancy, Boudreau and Moser of

handcuffing him to a coat rack, slapping him, kicking him in the groin, punching him in the

head, and dropping him to the floor. He claims he was never read his Miranda Rights and was

denied access to an attorney. He was given a statement to sign that was not true and included

information he never provided.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 92.

93.     Sean Tyler, Plaintiff's brother, was beaten in his chest and face until he vomited blood and signed a confession.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 93.

### The City of Chicago's Policy and Practice of Prosecuting Innocent People in Violation of their Constitutional Guarantees

94.     The Chicago Police Department is responsible by virtue of its official policies and practices for scores of miscarriages of justice like those its employees inflicted on Plaintiff.

**ANSWER:**     Defendant City denies the allegations in paragraph 94.

95.     Since the 1980s no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 95.

96.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to, using physically and psychologically coercive tactics to obtain involuntary and false confessions, fabricating evidence, concealing exculpatory evidence, manipulating or threatening witnesses to influence their testimony —all to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 96.

97.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated evidence against innocent people by coercing (physically and psychologically), manipulating, threatening, pressuring, and offering inducements to suspects and witnesses.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph 97.

98.     As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of an innocent person.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 98.

99.     In 2019, the Federal Bureau of Investigation and Department of Justice admitted Chicago Police Department supervisor, Jon Burge—a supervisor for the Officer Defendants at one point—was aware that on numerous occasions that [sic] detectives he was supervising participated in the torture and physical abuse of persons being questioned.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed to it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 99.

100.     Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 100.

101.     The municipal policy and practice set out in the paragraphs above was recently

40

described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant

State's Attorney Terrence Johnson. The report documents, among other things, that Chicago

police detectives fed information to witnesses and coached them through court-reported and

handwritten statements, and physically abused witnesses.

**ANSWER:** Defendant City admits the existence of an FBI 302 Report purportedly reflecting a 2012 interview with former Assistant State's Attorney Terence Johnson, and refers to that document for its content. The City denies the allegations in the FBI 302 Report and therefore denies the remaining allegations in paragraph 101. .

102. In addition to the problems identified above, the City of Chicago and the Chicago

Police Department routinely failed to investigate cases in which Chicago police detectives

recommended charging an innocent person with a serious crime, and no Chicago police officer

has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER:** Defendant City denies the allegations in paragraph 102.

103. Before and during the period in which Plaintiff was falsely charged with the

Rodney Collins' murder, and later convicted of the murder, the City of Chicago operated a

dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The

City's Office of Professional Standards almost never imposed significant discipline against

officers accused of violating civilians' civil and constitutional rights. The Chicago Police

disciplinary apparatus included no mechanism for identifying police officers who were

repeatedly accused of engaging in misconduct.

**ANSWER:** Defendant City denies the allegations in paragraph 103.

104. As a matter of both policy and practice, municipal policymakers and department

supervisors condoned and facilitated a code of silence within the Chicago Police Department. In

accordance with this code, officers refused to report and otherwise lied about misconduct

committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:**     Defendant City denies the allegations in in paragraph 104.

105.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Officer Defendants here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 105.

106.     The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a.  The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

b.  The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c.  The risks of engaging in tunnel vision during investigation.

d.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:**   Defendant City denies the allegations in paragraph 106.

107.   The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:**   Defendant City denies the allegations in paragraph 107.

108.   The City's failure to train, supervise, and discipline its officers, including the Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Mr. Henderson in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices [sic], as alleged above.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 108.

109.   The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:**   Defendant City denies the allegations in paragraph 109.

110.   The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER:**   Defendant City denies the allegations in paragraph 110.

**Plaintiff's Damages**

111.     Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff was incarcerated for 26 years for a crime he did not commit. He woke up each day with this reality, not knowing whether he would see his family outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 111.

112.     Over the course of his 26 years of imprisonment, Plaintiff was separated from his loved ones, including his infant daughter who was five months old when Plaintiff was wrongfully arrested. He grieved the loss of some of those loved ones who he was never able to embrace again after the Defendants took him from his life [sic] on March 30, 1994. Plaintiff experienced the pain of missing his daughter as she grew from a baby into a little girl, a teenager, a young woman, and a mother herself. Plaintiff went to prison with a baby girl at home and was released when his daughter was 27 years old and he was a grandfather.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 112.

113.     As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 113.

**COUNT I**
**42 U.S.C. § 1983 – Coerced (False) Confession Under Fifth and Fourteenth Amendments**

114.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Defendant City repeats and re-alleges its answers to all of the paragraphs in Plaintiff's Complaint as if fully set forth herein.

115.     As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well [as] under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by using violence, threats of violence, trickery, manipulation, and deceit to compel Plaintiff against his will to make or adopt statements that were later used to convict him.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 115.

116.     In the manner described more fully above, Defendants coerced Plaintiff to make or adopt statements that were introduced as inculpatory evidence for crimes they knew he did not commit. Defendants falsified police reports and gave false testimony before a grand jury and at trial about the misconduct they used in securing this false evidence. They failed to correct the fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 116.

117.     The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

45

**ANSWER:**  Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 117.

118.  Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Rodney Collins. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

**ANSWER:**  Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 118.

119.  Notwithstanding its effect on the outcome of the trial or even the truth or falsity of the statements, the mere use of Plaintiff's physically coerced statements at his trial violates his Fifth and Fourteenth Amendment rights against compelled self-incrimination.

**ANSWER:**  Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 119.

120.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**  Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 120.

121.  As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**  Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 121.

122.  The misconduct described above in this Count by the Defendant officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 122.

WHEREFORE, Defendant City requests judgment in its favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT II
### 42 U.S.C. § 1983 – Fabrication of Evidence

123.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Defendant City repeats and re-alleges its answers to all of the paragraphs in Plaintiff's Complaint as if fully set forth herein.

124.    As more fully described above, the Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements and by fabricating Kenneth McGraw's statements and introducing those statements at Plaintiff's trial.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 124.

125.    In the manner described more fully above, Defendants fabricated, coerced, and strong-armed a false handwritten statement from the Plaintiff that he signed under duress to stop the abusive interrogation. That fabricated statement was introduced against him as evidence at trial.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 125.

126.    In the manner described more fully above, Defendants fabricated, manipulated and/or solicited false statements from Kenneth McGraw implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using this false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 126.

127.    Defendant ASA Bigane fabricated a false oral statement from whole cloth that she attributed to Plaintiff but did not memorialize and testified to the false statement at Plaintiff's trial.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 127.

128.    The Police Officer Defendants and Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the allegations in this paragraph 128.

129.    Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Rodney Collins. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 129.

130.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 130.

131.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 131.

132.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 132.

WHEREFORE, Defendant City requests judgment in its favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT III
## 42 U.S.C. § 1983 – *Brady* Violations

133.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:** Defendant City repeats and re-alleges its answers to all of the paragraphs in Plaintiff's Complaint as if fully set forth herein.

134.    As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of

their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the

Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from

Plaintiff and the prosecutors who tried the case.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 134.

135.    The Prosecutor Defendants, while acting in an investigatory function, also

withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up

to and including the time of Plaintiff's conviction.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 135.

136.    The Defendants continued to suppress exculpatory evidence after Plaintiff's

conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 26 years

in prison for a crime he did not commit.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 136.

137.    The misconduct described above was objectively unreasonable and was

undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and

in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 137.

138.    As a direct and proximate result of this deprivation of his constitutional right to a

fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish,

humiliation, degradation, emotional pain and suffering, and other grievous and continuing

injuries and damages.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are

directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 138.

139.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 139.

WHEREFORE, Defendant City requests judgment in its favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT IV
### 42 U.S.C. § 1983 – Prolonged Unlawful Detention

140.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Defendant City repeats and re-alleges its answers to all of the paragraphs in Plaintiff's Complaint as if fully set forth herein.

141.     In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

**ANSWER:**     Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 141.

142.     The Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are

directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 142.

143.    In so doing, the Defendants caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 138.

144.    The Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 144.

145.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 145.

146.    As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited [sic] to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are

directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 146.

147.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 147.

WHEREFORE, Defendant City requests judgment in its favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

### COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

148.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Defendant City repeats and re-alleges its answers to all of the paragraphs in Plaintiff's Complaint as if fully set forth herein.

149.    All of the Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 149.

150.    All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described

above.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 150.

151.    In this manner, the Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 151.

152.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 152.

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 153.

154.    As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 154.

155.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 155.

WHEREFORE, Defendant City requests judgment in its favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT VI
## 42 U.S.C. § 1983 – Failure to Intervene

156.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Defendant City repeats and re-alleges its answers to all of the paragraphs in Plaintiff's Complaint as if fully set forth herein.

157.    In the manner described above, one or more of the individual Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 157.

158.    These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 158.

159.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 159.

160.    As a direct and proximate result of this failure to intervene to prevent the violation

of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of

liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other

grievous and continuing injuries and damages.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are
directed against it. Defendant City lacks knowledge or information sufficient to
admit or deny the remaining allegations in paragraph 160.

161.    The misconduct described above in this Count by the Defendant officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VII.

**ANSWER:** Defendant City denies the allegations in this paragraph.

WHEREFORE, Defendant City requests judgment in its favor and against Plaintiff, costs

of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT VII
### 42 U.S.C. § 1983 – *Monell* Policy Claim

162.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

**ANSWER:** Defendant City repeats and re-alleges its answers to all of the paragraphs in
Plaintiff's Complaint as if fully set forth herein.

163.    The Chicago Police Department is responsible for scores of miscarriages of

justice. Since 1986, no fewer than 100 documented cases have come to light in which Chicago

Police Detectives amassed "evidence" against an innocent person for a serious crime that he did

not commit. There are undoubtedly many more such cases that have not yet been discovered.

**ANSWER:** Defendant City denies the allegations in paragraph 163.

164.    The false charges against innocent people include numerous cases in which

Chicago Police Officers used the very same tactics that the Defendant Officers employed against

Plaintiff in this case, including: (1) physical abuse and coercion to procure an inculpatory statement/confession; (2) the fabrication of false oral statements; (3) concealment of exculpatory evidence; (4) physical abuse/coercion and manipulation of witnesses in order to obtain false statements against Plaintiff; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 164.

165. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically used prolonged physical violence and psychological coercion to force suspects to make false inculpatory and incriminating statements against themselves. As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 165.

166. Consistent with the municipal police [sic] and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to regurgitate a false and fabricated confession that was later used as the primary piece of evidence against him.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 166.

167. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory

57

and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 167.

168.   Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Plaintiff's alleged handwritten statement was involuntary and procured through physical coercion, that Kenneth McGraw's statement was procured through physical violence, manipulation, threats and coercion, and that certain oral statements attributed to the Plaintiff were fabricated in their entirety.

**ANSWER:**   Defendant City denies the allegations in this paragraph.

169.   At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false evidence against suspects.

**ANSWER:**   Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 169.

170.   Consistent with the municipal policy and practice described in the preceding

paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of McGraw to falsely implicate Plaintiff in the shooting of Rodney Collins.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 170.

171.    The City of Chicago and the Chicago Police Department has [sic] failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER:**     Defendant City denies the allegations in paragraph 171.

172.    Prior to and during 1994, the year in which Plaintiff was falsely charged with the Collins' murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer [sic] of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

**ANSWER:**     Defendant City denies the allegations in paragraph 172.

173.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:**     Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 173.

174.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 174.

175.    The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the physical coercion of fabricated confessions, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which the Defendant Officers have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he [sic] did in this case. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 175.

176.    The City of Chicago and its Police Department failed in 1994 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the

following areas, among others:

a.  The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.  The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.  The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

d.  The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.  The risks of engaging in tunnel vision during investigation.

f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:**  Defendant City denies the allegations in paragraph 176.

177.  The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:**  Defendant City denies the allegations in paragraph 177.

178.  The City's failure to train supervise and discipline its officers, including repeat offenders such as the Defendants in this case, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of

the City's practices and *de facto* polices, as alleged above.

**ANSWER:** Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 178.

179.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:** Defendant City denies the allegations in paragraph 179.

180.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER:** Defendant City denies the allegations in paragraph 180.

181.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago [sic] which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

  a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.

  b.    manufacturing and fabricating false suspect and witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate

testimony.

c.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, and otherwise covering up the true nature of those interviews and/or interrogations.

d.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the Defendants in this case.

e.    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of

silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

**ANSWER:**    Defendant City denies the allegations in this paragraph to the extent they are directed against it. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 181.

182.    The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

**ANSWER:**    Defendant City denies the allegations in paragraph 182.

183.    As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

**ANSWER:**    Defendant City denies the allegations in paragraph 183.

184.    The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

**ANSWER:**    Defendant City denies the allegations in paragraph 184.

WHEREFORE, Defendant City requests judgment in its favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT XIII
## State Law Claim – Indemnification

210.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.[1]

**ANSWER:**    Defendant City repeats and re-alleges its answers to all of the paragraphs in

---

[1] Plaintiff's First Amended Complaint does not include any allegations numbered 185 through 209.

Plaintiff's Complaint as if fully set forth herein.

211.    Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

**ANSWER:**    Defendant City states that the allegations in this paragraph are an inaccurate and incomplete statement of the law, and therefore denies these allegations.

212.    The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:**    Defendant City admits that the Individual Defendant Officers are or were employees of the City of Chicago (an agency of the City of Chicago) and were acting within the scope of their employment during the investigation of the Collins murder. Defendant City lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 212.

213.    Similarly, Defendant Bigane and Klaczynski are or were employees of the Cook County State's Attorney's office, an agency of Cook County, Illinois, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:**    Defendant City lacks knowledge or information sufficient to admit or deny the allegations in paragraph 213.

WHEREFORE, Defendant City requests judgment in its favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## **AFFIRMATIVE DEFENSES**

1.    The City of Chicago is immune from the imposition of punitive damages under both state and federal law. Punitive damages cannot be imposed against a municipality in a Section 1983 action. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Moreover, under Illinois law, the City of Chicago cannot be required to indemnify an employee

for punitive or exemplary damages, nor may it pay a judgment for punitive damages on behalf of an employee. *See* 745 ILCS 10/2-102.

2.     Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff must be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

3.     To the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by any wrongful conduct on the part of Plaintiff, any verdict or judgment obtained by Plaintiff on any of his claim brought under Illinois law and based on any finding of "reckless" willful and wanton behavior, as opposed by "intentional" willful and wanton behavior, must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case. *See Poole of City of Rolling Meadows*, 167 Ill.2d 41, 656 N.E.2d 768 (1995).

4.     Under Illinois law, the City of Chicago is not liable for conduct committed by employees found to be not acting within the scope of their employment. *See Wright v. City of Danville*, 174 Ill.2d 392, 675 N.E.2d 110 (1996).

5.     The City is not liable under § 1983 if Plaintiff does not prove any violation of his constitutional rights. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

6.     A municipality is not liable under a theory of *respondeat superior* for the constitutional violations of its employees. *See Board of County Commissioners of Bryan County, Okl. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 1385 (1997).

7.     The City is not liable to Plaintiff if its employees or agents are not liable to Plaintiff. 745 ILCS 10/2-109.

8. To the extent Plaintiff's claims rely upon criminal trial court rulings, those claims may be barred or limited by the application of the doctrines of waiver, *res judicata*, collateral estoppel, and/or judicial estoppel.

9. Plaintiff's failure to intervene claim has no basis in the Constitution as "[f]ailure to intervene sounds like vicarious liability," which would be untenable, as "[t]he Supreme Court has held many times that Section 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring).

10. "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

## **JURY DEMAND**

Defendant City of Chicago demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated: January 15, 2024      Respectfully submitted,

     /s/ Lisa M. Meador
     LISA M. MEADOR Atty. No. 6270259

James G. Sotos      Special Assistant Corporation Counsel
Lisa M. Meador      *One of the Attorneys for City of Chicago*
David A. Brueggen
George J. Yamin Jr.
Daniel J. McGinnis
Alexis M. Gamboa
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
lmeador@jsotoslaw.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on January 15, 2024, I electronically filed the foregoing **Defendant City of Chicago's Answer, Affirmative Defenses and Jury Demand to Plaintiff's Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed below.

***Attorneys for Plaintiff***
Jennifer A. Bonjean
Ashley B. Cohen
Gabriella Orozco
Bonjean Law Group, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
718-875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com
gabriella@bonjeanlaw.com

**Attorney for Steven Klaczynski and Virgina Bigane**
Matthew R. Howroyd
James M. Lydon
Stephen Mehr
Michael C. Stephenson
Stephen D. Mehr
Hinshaw & Culbertson LLP
151 N. Franklin St, Suite 2500
Chicago, IL 60606
312-704-3288
mhowroyd@hinshawlaw.com
jlydon@hinshawlaw.com
smehr@hinshawlaw.com
mstephenson@hinshawlaw.com
smehr@hinshawlaw.com

***Attorneys for Cook County***
Kelli Huntsman
Cook County State's Attorney's Office
500 Richard J. Daley
Chicago, IL 60602
312-603-7379
kelli.huntsman@cookcountyil.gov

**Attorney for Defendant Officers**
Eileen Rosen
Andrew Grill
Brittany Johnson
Patrick Moran
Rock Fusco & Connelly, LLC
333 West Wacker Dr., 19th Floor
Chicago, IL 60606
(312) 494-1000
erosen@rfclaw.com
agrill@rfclaw.com
bjohnson@rfclaw.com
pmoran@rfclaw.com

/s/ Lisa M. Meador
LISA M. MEADOR Atty. No. 6270259
***One of the Attorneys for City of Chicago***